BARR, Respondent, vs. CHURCH, Garnishee, Appellant.

*May 6 — May 24, 1892.*

*Debtor and creditor: Fraudulent conveyances: Evidence.*

1. An insolvent debtor may, by transfer of property or otherwise, pay debts honestly due to his relatives or friends, in preference to those due to other persons; and where such transfer is made in good faith, the mere fact that, by depriving him of means to pay his other creditors, it incidentally hinders or delays the latter, does not render the transaction void.
2. The evidence in this case is *held* not to sustain findings of the trial court to the effect that transfers of all his property by an insolvent debtor to his father in payment of a debt due to the latter were made with intent to hinder, delay, or defraud other creditors.
3. Such transfers were not rendered void as to creditors whose claims accrued prior thereto by the mere fact that for a short time thereafter the father permitted the son to retain possession of the property.
4. The mere fact that the bank account of the son had been kept in the name of his father did not tend to show that the transfers were fraudulent.

APPEAL from the Circuit Court for *Walworth* County. October 5, 1889, the plaintiff commenced an action against Merlin H. Church to recover sundry sums due August 15

and 16, 1888, to sundry persons, including the plaintiff, for milk, butter, and cheese sold and delivered to him at agreed prices, and $100 money loaned, and all of which had been assigned to the plaintiff except his own, and the same belonged to him, and in the aggregate amounted to $1,373.59, and interest from August 15, 1888. Judgment was entered therein in favor of the plaintiff and against Merlin, November 12, 1889, for $1,629.59, damages and costs. At the time of commencing that action, October 5, 1889, the plaintiff also garnished *Cyrus Church*, the father of said Merlin, and in the affidavit of garnishment stated that the whole amount due from Merlin to the plaintiff, over and above all offsets, was $1,169.14, and that the garnishee was indebted to Merlin, and had property, real and personal, in his possession, belonging to him, not exempt. *Cyrus Church* answered thereto under oath, to the effect that he was not indebted to, and had no property belonging to, the said Merlin.

The plaintiff took issue on the garnishee's answer, and, a jury having been waived, the cause was tried by the court, and at the close of the trial the court found, in effect, among other things, the recovery of said judgment against Merlin as stated; that the patrons of the factories, including the plaintiff, were accustomed to receive checks from Merlin in payment for their respective dividends during each month; that nearly all of said checks, except those upon which this action is based, were drawn signed with the name of *Cyrus Church*, and had always been drawn in that way, with his knowledge and consent, and the moneys received from sales of the products of said factories were continually deposited in the banks named to the credit of said *Cyrus Church*, and so continued until August 18, 1888; that said *Cyrus Church* furnished the necessary credit for carrying on said business, and also furnished the factory building and premises on said farm, and

was generally familiar with the business condition of the enterprise; that August 7, 1888, Merlin sold, transferred, and delivered to his father property at the agreed price as mentioned in the opinion; that August 7, 1888, Merlin was indebted to his father in the sum of $4,000 for moneys which had gone into said factory business, and also was further indebted to him in the sum of $450 for one half the purchase price of fifteen cows; that August 7, 1888, Merlin was insolvent and financially embarrassed, and had been for several months prior thereto, to the knowledge of his father, who permitted him to remain, as to the world and the patrons dealing with him, in the same exclusive and notorious open possession of the real and personal property mentioned, until August 18, 1888; that August 10, 1888, Merlin sold the Linn factory to Gillis, as mentioned in the opinion; that Merlin, with the knowledge of his father, remained in the notorious and exclusive possession of all of said real and personal property, as to the whole world, until August 18, 1888, dealing and trafficking with the plaintiff and other patrons as before; that said sale to said Gillis and to his father was held and kept a profound secret until after August 15, 1888; that said property so transferred constituted all the property owned by Merlin, including exemptions; that said real and personal property was so transferred to said *Cyrus* and received by him with intent to hinder, delay, and defraud the creditors of Merlin in the enforcement and collection of their claims; that nearly one half of said property so received by said *Cyrus* had, prior to and since the commencement of this garnishee action, been converted into cash; that at the time the garnishee process herein was served upon said *Cyrus* he was the holder and possessor of all the property so transferred to him, or its equivalent in value, and that the same was of the value of $4,450.

The court found, as conclusions of law, in effect, that

Barr vs. Church.

such transfer of real and personal property to said *Cyrus* was fraudulent and void as to the creditors of said Merlin, and particularly to the extent of the plaintiff's judgment against him, and was taken by said *Cyrus* at the value mentioned, with intent to hinder, delay, and defraud the creditors of said Merlin; that said *Cyrus*, at the commencement of this garnishee action, was the fraudulent holder of said property, to the extent of the plaintiff's claim, and should therefore be held as garnishee; and that he is lawfully bound to pay and satisfy the said judgment against Merlin. From the judgment ordered thereon accordingly the defendant *Cyrus Church* appeals.

For the appellant there was a brief by *E. H. Sprague*, and oral argument by *Mr. Sprague* and *Mr. A. L. Sanborn*.

For the respondent there was a brief by *Wallace Ingalls*, and oral argument by *Mr. Ingalls* and *Mr. T. W. Spence*.

CASSODAY, J. It is undisputed that Merlin H. Church is the son of the garnishee, *Cyrus Church;* that he got married in 1880, but continued to live in a part of his father's house in the town of Walworth; that in 1882 Merlin took his father's farm of 240 acres, on which they lived, to work on shares, and continued to run the same; that there was a building on the farm for setting milk and raising cream; that January 26, 1886, Merlin and one Peterson, as proprietors, started a manufactory of cream into butter thereon, upon what is known as the " divide plan," under an agreement to continue for one year; that Merlin and his father, as owners of the products of the farm, with others in the vicinity, became patrons of that factory, and as such elected *Cyrus* treasurer; that the products of the sales of that factory were deposited in the Harvard Bank and the Citizens' Bank in the name of *Cyrus;* that Merlin checked them out as required, in the name of his father; that about January 26, 1887, Merlin bought out Peterson, and ran the

factory in his own name, and on an entirely different plan, by buying the cream and manufacturing and selling the products as his own; that the father thereupon ceased to be treasurer, or to have any connection with the factory, except that he and Merlin, as owners of the products of the farm, with others in the vicinity, were its patrons; that about the same time, and early in 1887, Merlin became the owner of two other like factories,— one in the town of Linn, about eight miles from his father's, and the other at Delavan; that each of these three factories, having its own patrons, was run entirely separate and independent of the others, except that Merlin continued, as previously, to deposit moneys, in the name of his father, in both the Harvard Bank and the bank of E. Latimer & Co. at Delavan, until the forepart of August, 1888; that during the said period one D. M. Gillis was running a similar and rival factory just south of the state line; that February 9, 1888, Merlin sublet his father's farm to Guttschaw; that soon after Merlin began to run behind financially, and borrowed money from his father and from the banks on notes signed by his father, so that August 7, 1888, Merlin was indebted to his father for money borrowed and liabilities to the amount of $4,450; that, in pursuance of a demand made by his father a few days before, Merlin on that day paid on such indebtedness $2,393.73 by way of a bill of sale of personal property on the farm, $347.20 by way of an assignment of his interest in said lease, and $600 by way of the conveyance of his equity of redemption in forty acres of land, leaving a balance still due his father of $1,109.07; that on August 10, 1888, Merlin, by an instrument in writing, sold and transferred to said D. M. Gillis the factory in Linn, and a lease of the ground, and also certain tools and personal property in the Walworth factory, for $2,000; that Gillis paid therefor $500 cash, and gave one note due March 1, 1889, for $1,000, and another note due September 1, 1889, for $500; that said transfer in writing contained

·provisions to the effect that Gillis was to have the making
and earnings derived from the Linn factory after August
1, 1888, together with the butter and cheese on hand from
that date, subject to the dividends to patrons on said but-
ter and cheese; that Gillis was to take possession of the
Linn factory August 15, 1888; that Gillis was to have the
use and net profits of the Walworth factory until January
1, 1889, without charge, and until that time continue to
conduct the business therein as his own, in the name of
Merlin, by paying for all milk and cream delivered after
August 15, 1888, and Gillis was to furnish funds to pay for
all labor and expenses incurred, and for all milk and cream,
when due; that said Merlin therein agreed, with certain
exceptions, to refrain from again engaging in such business
for a period of twenty years; that such management of
the Walworth factory by Merlin for the use and benefit
of Gillis until January 1, 1889, was to remain and·be kept
strictly secret and confidential; that August 15, 1888, Gillis,
in pursuance of the transfer to him, took full possession of
the Linn factory, with all the product of the August milk
of its patrons; that on the same day Merlin settled with a
large number of such patrons of the Linn factory, includ-
ing the plaintiff, for milk which they had delivered during
the previous months of June and July, by giving to them,
respectively, checks for the amount on the Citizens' Bank,
signed by himself alone, and payable ten days from that
date; that at the time of giving said checks he informed
such patrons, including the plaintiff, that he had sold the
Linn factory to Gillis, who was to have the product from
August 1, 1888; that seventeen of these checks so given·
form the basis of this action against Merlin; that August
18, 1888, Merlin offered to sell or discount to Gillis the two
notes he then held against him, amounting to $1,500, for
$1,200, but was unable to do so; that thereupon, and on
the same day, he transferred the same to his father, upon
his said indebtedness, at the agreed price of $1,000; that

Barr vs. Church.

Merlin then owed other parties to the amount of about $3,500, and had nothing with which to pay them; that more than a year prior to the commencement of this action the father had paid up all of such outstanding notes which he had thus signed with or for the benefit of Merlin.

The genuineness of the indebtedness from Merlin to his father is conceded. It is the undisputed law of this state that an insolvent debtor may refrain from making a general assignment for the benefit of his creditors, and in good faith pay some of them in preference to others. While such law remains, it must be expected that such insolvents will prefer their relatives and friends rather than others. A careful reading of the testimony in this case convinces us that the payment of the father by the son was made in good faith, and with no intent to hinder, delay, or defraud other creditors. True, the paying of one creditor by an insolvent debtor may result in leaving him without means to pay or secure others, but such incidental hindering or delaying does not come under the condemnation of the statute. The findings of the trial court seem to be based upon some misapprehensions. Counsel for the plaintiff concede that the property transferred and conveyed from the son to the father, August 7, 1888, was of the agreed value in the aggregate of only $3,340.90, instead of $3,450, as found by the court. There is no evidence to sustain the finding to the effect that any of the claims or demands upon which the judgment herein against Merlin is based accrued in August, 1888; but, on the contrary, it clearly appears that they all accrued prior to that time. The evidence does not sustain the findings to the effect that the Walworth factory and the Linn factory were operated as one joint business enterprise, otherwise than as stated, or that the same patrons delivered their milk to both factories, or that Merlin expected to redeem the property transferred to his father up to the time of his failure, or that any of the persons who held the claims upon which said judgment is

Barr vs. Church.

based had been deceived into giving such credit by reason of Merlin's remaining in possession of either of said factories after they were so transferred. The retention of the possession of the Walworth factory was manifestly for the convenience and benefit of Gillis, and the retention of the possession of the Linn factory appears to have been for the mere convenience of the parties, since Gillis was to have all as of August 1, 1888. Had the plaintiff's claims accrued during such possession and subsequent to such transfer, there might be some ground for sustaining the judgment. The mere fact that the bank account had been kept in the name of the father does not tend to show that any of such transfers were fraudulent. Had the action been brought for the purpose of charging the father as one of the proprietors of the business, then such evidence might have been of some significance. It is unfortunate that the other creditors of Merlin were unable to get their pay; but, after a careful reading of the testimony, we are forced to the conclusion that the evidence does not warrant the finding that he made the payments to his father, mentioned, with the intent to hinder, delay, or defraud his creditors; much less that the garnishee participated in any such fraudulent intent.

The law applicable to the facts and in support of our conclusions has been so often and so recently enunciated by this court as to require no further discussion here. *First Nat. Bank v. Bertschy*, 52 Wis. 438; *Mehlhop v. Pettibone*, 54 Wis. 652; *Erdall v. Atwood*, 79 Wis. 1; *Second Nat. Bank v. Merrill*, 81 Wis. 142, 151; *Bannister v. Phelps*, 81 Wis. 256.

*By the Court.*— The judgment of the circuit court is reversed, and the cause is remanded with directions to render judgment in favor of the garnishee and against the plaintiff.

WINSLOW and PINNEY, JJ., took no part.